UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

SABRINA W.[1]

                        Plaintiff,

      v.

COMMISSIONER SOCIAL SECURITY
ADMINISTRATION,

                       Defendant.

Case No. 6:19-cv-00032-AC

OPINION AND ORDER

_____

ACOSTA, Magistrate Judge:

      Plaintiff Sabrina W. ("Plaintiff") filed this action under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner") who denied her social security disability

insurance benefits ("DIB") and supplemental security income ("SSI")(collectively "Benefits").

The court finds the decision of the Administrative Law Judge ("ALJ") to characterize Plaintiff's

_____

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of
the non-governmental party in this case.

PAGE 1 - OPINION AND ORDER

past relevant work as apartment manager, rather than a composite job of apartment manager and apartment maintenances, and his reasons for discounting Plaintiff's subjective testimony are supported by the record. Accordingly, the Commissioner's final decision is affirmed. [2]

*Procedural Background*

On June 25, 2010, Plaintiff filed applications for Benefits alleging an onset date of May 30, 2010, for limitations related to osteoporosis and right-eye blindness. The applications were denied initially, on reconsideration, and by ALJ Rudolph M. Murgo ("ALJ Murgo") after a hearing held on September 21, 2012 ("First Hearing"). In his decision dated October 5, 2012, ALJ Murgo found Plaintiff was "capable of performing past relevant work as an apartment manager" as that job is "generally performed" and was not disabled through October 5, 2012. (Tr. of Social Security Administrative R., ECF No. 22 ("Admin. R."), at 104, 106.) He expressly relied on the vocational expert's testimony on work-related activities required for Plaintiff's past relevant work of apartment manager, apartment maintenance, day care worker, and hospital housekeeper, and her conclusion that Plaintiff could still perform the duties of an apartment manager as identified in the Dictionary of Occupational Titles ("DOT"). (Admin. R. at 104.) The Appeals Council denied review and ALJ Murgo's decision became the final decision of the Commissioner for the period ending on October 5, 2012.

In June 2014, Plaintiff filed a new application for DIB, as well as an application for SSI, both alleging an onset date of October 6, 2012. The applications were denied initially, on reconsideration, and by ALJ Rebecca L. Jones ("ALJ Jones"), after a hearing held on February 15, 2017 (the "Second Hearing"). The Appeals Council accepted and considered Plaintiff's additional

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

arguments, including clarification of her duties performed in her past relevant work as an apartment manager, and denied review, making ALJ Jones's decision the final decision of the Commissioner.

*Factual Background*

Plaintiff is sixty years old.  In her applications, she represented she completed twelfth grade but explained at hearing that she finished "level eight" in German schools, which was significantly less than required for a high school diploma in America.  (Admin. R. at 13-14.)  Her past relevant work experience includes apartment manager and/or apartment maintenance worker.  Plaintiff has not been involved in a successful work attempt since August 2010.  She alleges disability because of degenerative bone and disk disease, an extra disk in her lower back, osteoarthritis, right-eye blindness, glaucoma and cataracts in her left eye, a "frozen" left shoulder, limited motion in her right shoulder, and bone spurs in both knees.  (Admin. R. at 434.)  Plaintiff last met the insured status requirements entitling her to DIB on December 31, 2015.  (Admin. R. at 96, 430.)

I.  Testimony

*A.  Conditions and Limitations*

Plaintiff, with the help of her husband, completed a Function Report on August 16, 2014 ("Report").  (Admin. R. at 460-67.)  She indicated her left shoulder is completely "locked up" and her right shoulder is "locking up," causing tremendous pain when she lifts, carries or reaches for things; that she experiences constant pain in her neck and shoulders; that she suffers headaches; and that she has numbness and loss of strength in her hands.  (Admin. R. at 460.)  She reported "tremendous" pain in her back when she stoops, bends, kneels, or walks for very long; her knees become weak with walking; and her right-eye blindness causes her to run into things.  (Admin. R. at 460.)

PAGE 3 - OPINION AND ORDER

Plaintiff described her average day as follows:

> I get up at 5:00 AM and my husband assists me with my daily needs that I can't do for myself. At 6:15 when my husband leaves to work, I lay back down, and sleep after taking medication. I get up around 10:00 to 10:30 AM, and let my medical dog to pee outside and feed him. Then I have lunch that is prepared most of the time. Then I relax and wait for my husband.

(Admin. R. at 461.)

Plaintiff stated she needed her husband's help with getting dressed, washing her back, shoulders, and hair in the shower, using a curling iron, and putting on jewelry due to her inability to reach or "do anything that stretches or pulls hard." (Admin. R. at 462.) She was able to make easy meals, mostly "TV dinners" and sandwiches, but needed her husband to open cans or containers, and lift heavy objects from shelfs, lower cupboards, and the refrigerator. (Admin. R. at 462.) She was unable to do any household chores other than dusting and wiping down counters within her reach for about ten minutes twice a week and her husband was primarily responsible for bathing, feeding, and walking the dog. (Admin. R. at 461, 463.) Plaintiff reported she did not shop; did not go outside by herself because of weakness in her legs, fear of falling, and panic attacks; and did not drive due to her poor vision. (Admin. R. at 463.) She did not spend time with others and left her apartment only to sit on a chair on her patio or porch or get the mail. (Admin. R. at 463-64.) She had difficulty sleeping due to pain in her joints, arms, shoulders, and neck. (Admin. R. at 461.)

Plaintiff indicated her conditions prevented her from lifting more than a few pounds, squatting or kneeling more than a minute or two, standing or walking more than fifteen to twenty minutes, and climbing more than a few steps. (Admin. R. at 465.) She had pain with bending, did not have normal strength in her hands, could not reach far, and had a blind spot and her ability to remember, concentrate, and complete tasks were lessened by fatigue. (Admin. R. at 465.) She has

PAGE 4 - OPINION AND ORDER

used a neck brace since prescribed in 2000, TENS therapy since prescribed in 2012, and glasses with a special lens since prescribed in 1968.  (Admin. R. at 460, 466.)

As a child, Plaintiff attended a school for the learning disabled in Germany because she missed a year and a half of school after losing her right eye when she was seven years old.  (Admin. R. at 13, 55.)  She is able to speak and read in both English and German, but able to write, add, and subtract well only in German.  (Admin. R. at 14, 15, 47.)

At the time of the both the First and the Second Hearing, Plaintiff lived in a ground floor apartment with her husband.  (Admin. R. at 9, 45.)  She testified she had her driver's license and drove, on average, twice a week during daylight hours. (Admin. R. at 11, 46.)  By the Second Hearing, Plaintiff's husband had been receiving DIB for six months due to a terminal cancer diagnosis.  (Admin. R. at 10.)

In the First Hearing, Plaintiff testified she had pain in her neck, shoulders, and low back, for which she took Advil and other pain relievers that "helped [her] a lot."  (Admin. R. at 57, 58.)  Her treating physician recommended stretching and heat exercises, but Plaintiff discontinued such treatment because it hurt.  (Admin. R. at 59-60.)

Plaintiff explained her average day included taking a shower, making breakfast, drinking coffee, watching television, picking up the house a bit, taking care of her seven-pound Pomeranian, communicating with her sister on the computer for fifteen or twenty minutes at a time, and walking the dog with her husband when he returned from work.  (Admin. R. at 52-54, 60.)  Her husband helped her with her personal care, such as showering and combing her hair, as well as cooking.  (Admin. R. at 51-52.)  Plaintiff did the dishes, swept the floor, and dusted the house while her husband did most of the shopping and the laundry.  (Admin. R. at 52.)  Plaintiff reported she was unable to walk more than fifteen to twenty minutes (about two blocks) or sit for an hour, could lift

PAGE 5 - OPINION AND ORDER

a gallon of milk with her right hand, but not her left, and needed to recline four or five times a day for thirty to forty-five minutes to relax her back.  (Admin. R. at 50, 51, 60.)

At the Second Hearing, Plaintiff represented she was unable to work due to pain in her shoulders and lower back that caused extreme headaches and required prescription medication or injections, as well as issues related to previous knee surgeries.  (Admin. R. at 19, 24.)  She indicated her pain started in the upper part of her neck, moved to the middle of her back, and then shot down her arms and left her hands stiff and fingers numb.  (Admin. R. at 21-22.)  She took Tylenol and Advil daily for her shoulder pain and Tramadol or hydrocodone for break-out pain about every other day.  (Admin. R. at 21.)  She purchased a TENS unit that "relieve[d] . . . the immediate pain a bit" in the morning and allowed her to move around and take her medication.  (Admin. R. at 25.) She claimed strength and nerve conduction tests established she had chronic permanent muscle damage but was unable to identify any such testing other than a nerve conduction study in 2014 that was normal.  (Admin. R. at 20.)

Plaintiff reported she could walk half a block before needing to rest for three or four minutes and sit for about twenty minutes before needing to move around for three or four minutes. (Admin. R. at 26, 27.)  She occasionally used a walker to get around the apartment, do laundry, and get the mail.  (Admin. R. at 26.)  She indicated she shared the cooking, shopping, and cleaning duties with her husband, but she was primarily responsible for taking care of her two five-pound Pomeranians.  (Admin. R. at 12-13, 30.)  She was unable to lift and hold a one-liter soda bottle or lift more than two to three pounds occasionally and needed help with her personal care "almost daily," such as reaching for towels, getting dressed, and drying her hair.  (Admin. R. at 27-29.) She had difficulty concentrating and became confused when helping her husband with his medications.  (Admin. R. at 27.)

PAGE 6 - OPINION AND ORDER

Plaintiff testified she participated in two physical therapy sessions, which did not help. (Admin. R. at 20.) She subsequently reported she had physical therapy for eight months in 2015, after which her therapist recommended another course of physical therapy that was not approved by her treating physician. (Admin. R. at 20, 22.) Instead, Plaintiff's providers recommended psychological pain management treatment in February 2016, which Plaintiff did not start because "I had been to their office and there was no office." (Admin. R. at 23.) Plaintiff started treatment with a chiropractor for her low-back pain in early 2017, which seemed to help a "little bit." (Admin. R. at 24.)

*B. Past Relevant Work*

Plaintiff identified her immediate past relevant work as an apartment manager but provided varying descriptions of exactly what that job entailed. In the Work History Report completed by Plaintiff in the summer of 2010 shortly after she left her apartment manager job due to pain, she described the duties of the job to include: "Apartment manager of 104 unit complex. Move tenants in and out. Bookkeeping, filing, process applications. Manager maintenance (light duty). Schedule vendors and maintenance. Order supplies. Customer Service." (Admin. R. at 388.) She represented she walked, stood, and wrote, typed, or handled small objects two hours a day each, sat for three hours, and knelt and reached half an hour each. (Admin. R. at 388.) She used a drill, copier, phone, and fax machine and completed reports, including notices, contracts, and applications. (Admin. R. at 388.) She lifted no more than ten pounds, carried two or three files twenty feet four-to-ten times a day, was a "lead worker," and managed three people. (Admin. R. at 388.) At the First Hearing, Plaintiff testified she was unable to perform her duties as an apartment manager, which included sitting for "longer" periods of time, running upstairs, and lifting more than thirty to thirty-five pounds. (Admin. R. at 49.)

PAGE 7 - OPINION AND ORDER

In a second Work History Report completed in the summer of 2014, Plaintiff described her duties as an apartment manager this way: "Received and processed applications.  Made phone calls.  Inspected apartments.  Customer Service.  Had Vehicles towed.  File lock out and court procedures against Tenant.  I was able to obtain this position as Mgr. only because my husband was able to be hired with me as Mgr. II, to do lifting and any heavy work for me.  Therefore, we were hired as a team." (Admin. R. at 448.)  She reported she could not stand, sit, or walk for long without changing positions; she used only the copier and fax machine; lifted only pencils, paper, and the phone receiver; had her assistant managers lift items from shelfs for her; was not a "lead worker," and managed only one person.  (Admin. R. at 448.)

In a supplemental report completed on December 10, 2014, Plaintiff represented: "I can't do manager job or anything like that.  The job includes lifting, reaching, scooping, sitting, walking, climbing, writing, reading, driving at night or early morning when it is dark to court and other places.  Lifting file boxes, etc.  These I am unable to do." (Admin. R. at 468.)

At the Second Hearing, Plaintiff testified she started her employment with Cascade Management Rental ("Cascade") in April 2003 as an assistant apartment manager with duties of cleaning up trash, patrolling the complex at night, and making sure tenants secured their bicycles. (Admin. R. at 15, 17.)  She was promoted to manager after six months and her new job duties included office work and maintenance, with sixty-five percent of her time in maintenance activities, such as cleaning and repairing apartments between tenants, and cleaning the garbage area.  (Admin. R. at 15-17.)  "Maintenance" included basic plumbing repairs like unplugging garbage disposals, rinsing out dishwashers, emptying water tanks, and "pulling the hoses up into the apartments."  (Admin. R. at 16-17.)  "Office work" included accepting and reviewing applications, processing rental agreements, and facilitating move-ins. (Admin. R. at 16.)  Initially,

PAGE 8 - OPINION AND ORDER

Plaintiff and her husband were both hired by Cascade, with her husband handling the maintenance duties while she concentrated on the office work. (Admin. R. at 18, 59.) Once Plaintiff's husband obtained full-time work with another employer, Plaintiff assumed the maintenance duties. (Admin. R. at 18.)

On August 6, 2018, Plaintiff presented a clarification of her duties as apartment manager to the Appeals Council. (Admin. R. at 529-531.) Plaintiff explained:

> [M]y duties as Landlord/Manager is being thought and considered as simply sitting at a desk and doing paperwork. That is not true and can't be further from the facts of what that job details. While it is true my duties required Office Work such as writing, typing, filing documents and lifting file boxes, answering phone, using office tools and devices, etc. that was not the extent of the job requirements. The following is a partial list of other duties required of the job: Lifting and carrying items to storage, stock supplies, climb up and down a ladder or step stools for various reasons, carry heavy garbage bags to dumpster, clean out furniture and leftover belongings from tenants whom abandoned apartments, climbing up and down stairs to place notices or for other issues for 104 units, hook up hoses to drain water heaters or for maintenance and water lawn, hang interior blinds and curtains, making various repairs. Replace door knobs, door stops and even interior doors, vacuum offices or empty apartments and other cleaning tasks, walk property for security checks, change light bulbs, scrubbing and cleaning blood off walls, lawn care work, drive to court for eviction issues, etc. and much more.

(Admin. R. at 529.) She represented that on bad days, she was able to perform only twenty percent of her duties, and that these difficulties dated back to 2002 or 2005. (Admin. R. at 530.)

## II. Medical Evidence[3]

### A. Emergency Room Providers

On March 3, 2010, Plaintiff sought treatment from the emergency room at Salem Hospital for left-hand paresthesia and weakness, pain in her wrist and hand at night, and a cold pressure in

---

[3] Medical records from 1999-2001 are in German and not translated, and thus the court has not relied on them. (Admin. R. at 540-29.)

her left arm.  (Admin. R. at 551.)  Joseph K. Kenoyer, M.D. ("Dr. Kenoyer"), opined the symptoms were likely related to cervical spine disease and degenerative arthritis, and prescribed Ibuprofen as an anti-inflammatory and Vicodin for pain relief.  (Admin. R. at 553.)

During a second visit to the emergency room on January 10, 2012, Plaintiff complained of increased chronic pain in her shoulders and back for three days, as well as pain in her right shoulder and knee.  (Admin. R. at 575.)  John Vernon Ahlen, M.D. ("Dr. Ahlen"), opined Plaintiff's neck pain was secondary to her degenerative disc disease and she had "acute bicipital tendinitis of the right shoulder.  (Admin. R. at 575.)  Plaintiff refused Dr. Ahlen's offer of an injection in her right shoulder.  (Admin. R. at 575.)  Dr. Ahlen counseled Plaintiff on chronic pain management, recommended she establish care with a primary care physician, started her on an empiric trial of gabapentin, provided a prescription for Vicodin, and increased her dose of Ibuprofen.  (Admin. R. at 575-76.)

Plaintiff returned on June 2, 2013, with complaints of continuing neck and left shoulder pain, and numbness and tingling in the fourth and fifth digits of her left hand.  (Admin. R. at 571-72.)  Plaintiff reported the pain was a ten on a scale of one-to-ten, with ten being the most pain possible; that typically she is at pain level three or four with Advil and hydrocodone; and that her pain level depends on "what she is doing and how she lies when she sleeps."  (Admin. R. at 571.)  She indicated doctors told her surgery would likely be only "50/50 for improvement," physical therapy did not help, she used a TENS machine at home, and continued to do at-home exercises.  (Admin. R. at 572.)  The medical provider noted Plaintiff was tender in the mid-line cervical spine and had limited range of motion and pain in her left shoulder, but she had normal reflexes, muscle tone, gait, and coordination and was "in no distress."  (Admin. R. at 572.)  Plaintiff was diagnosed

with cervical radiculopathy, advised to follow up "with Dr. Stossel for re-evaluation and further treatment, and released with a prescription for a lidocaine patch.  (Admin. R. at 572.)

Plaintiff again visited the emergency room on January 15, 2016, for neck pain and a headache at a pain level of seven.  (Admin. R. at 684, 689.)  Plaintiff reported she was in therapy for the condition, normally used prescription medication for flare-ups but did not have any left, and she took two Advil, which did not help.  (Admin. R. at 684.)  Plaintiff provided a medical history of rotator cuff sprain, head injury, migraines, bronchitis, and coronary artery disease.  (Admin. R. at 684.)  Upon examination, Plaintiff had neck tenderness but no neck stiffness, weakness, or numbness, and normal range of motion.  (Admin. R. at 685.)  Ryan D. Kirkpatrick, M.D. ("Dr. Fitzpatrick"), gave her an intramuscular injection of pain medication and a dose of Vicodin for when the effects of the injection lessened, and directed her to follow-up with her primary care physician.  (Admin. R. at 686.)  Dr. Fitzpatrick also noted Plaintiff only filled two prescriptions for ninety pills of Vicodin in 2015.  (Admin. R. at 686.)

### B.  Treating Providers

#### 1.  Jane Akpamgbo, M.D.

On August 17, 2012, Plaintiff complained to Jane Akpamgbo, M.D. ("Dr. Akpamgbo") of reduced range of motion in her shoulders with accompanying pain.  (Admin. R. at 565.)  Dr. Akpamgbo referred Plaintiff to a two-week course of physical therapy.  (Admin. R. at 566.)  Plaintiff returned to Dr. Akpamgbo on June 7, 2013, again complaining neck and shoulder pain at a level of seven out of ten.  (Admin. R. at 615.)  Upon examination, Plaintiff exhibited limited range of motion in her left shoulder and neck, tenderness in her left shoulder, and moderate pain in her left shoulder with motion.  (Admin. R. at 617.)  Dr. Akpamgbo noted Plaintiff "is amenable to seeing a pain specialist and did not reject suggestion of getting rehabilitated and returning to

PAGE 11 - OPINION AND ORDER

work, be it part time." (Admin. R. at 615.)  Dr. Akpamgbo continued Plaintiff's prescriptions for

a muscle relaxant and Advil and referred Plaintiff to a pain clinic.  (Admin. R. at 615.)

       2.   Patricia M. Jimenez Mendez, M.D.

Plaintiff initiated treatment with a new provider, Patricia M. Jimenez Mendez, M.D. ("Dr.

Mendez") on March 26, 2014, stating she was unhappy with the previous clinic as "nothing gets

done."  (Admin. R. at 632.)  Plaintiff reported she had a "frozen left shoulder" and an "aching,

sharp and throbbing pain" in her right shoulder over the last four months aggravated by bending,

lifting, and movement, and relieved by rest.  (Admin. R. at 632.)  She also described stable,

persistent pain in her upper and lower back with sitting, twisting, and walking that is relieved by

medications.  (Admin. R. at 632.)  Plaintiff claimed an MRI from "about 2 years ago" resulted in

a diagnosis of "severe degenerative disc disease."  (Admin. R. at 632.)  Dr. Mendez observed a

slightly antalgic gait, the absence of an assistive device, tenderness in the cervical and lumbar

spine and shoulders, mildly reduced range of motion in her neck with moderate reduced range of

motion in her back and shoulders, and moderate pain with motion in the lumbar spine.  (Admin.

R. at 633-34.)  Dr. Mendez referred Plaintiff for cervical, lumbosacral, and shoulder x-rays, and

prescribed Norco for pain.  (Admin. R. at 634-35.)

Plaintiff returned to Dr. Mendez in December 2014 for a preventative exam with reports

of neck pain.  (Admin. R. at 662.)  Plaintiff explained the neck pain had worsened and was constant

and sharp.  (Admin. R. at 662.)  The pain was located mostly between her shoulder blades and was

"moderate."  (Admin. R. at 662.)  Dr. Mendez noted Plaintiff's cervical spine was tender with a

mildly reduced range of motion, she had an antalgic gait but walked without an assistive device,

and her hand grip was slightly weak but equal.  (Admin. R. at 663.)  She diagnosed Plaintiff with

cervical spondylosis with radiculopathy, restarted a Norco prescription for severe pain in addition

PAGE 12 - OPINION AND ORDER

to naproxen, and referred Plaintiff for an MRI of her cervical spine. (Admin. R. at 663.) Plaintiff returned on March 20, 2015, for a follow up for her neck pain that had been aggravated by coughing. (Admin. R. at 726.) Dr. Mendez renewed the Norco prescription and prescribed an antibiotic and decongestant for the cough. (Admin. R. at 727.)

In early May 2015, Plaintiff contacted Dr. Mendez's office complaining of neck, shoulder, and arm pain and reported she was willing to consider surgery, stating "I just want this fixed," and "I am tired of being in pain." (Admin. R. at 677-81.) Plaintiff indicated the pain was worse in her neck and traveled to both arms with resulting weakness in both hands occasionally preventing her from opening jars and cans. (Admin. R. at 679.) She represented the pain originated with a fall in 1998; was worse with standing, walking, and activity; and prevented her from lifting a laundry basket or getting dressed without assistance. (Admin. R. at 679.) She reported she attended physical therapy twice a week for a month in 2013, which provided some short-term relief, and continued to take Advil, Norco, and Naproxen. (Admin. R. at 680.) It appears Dr. Mendez's office referred Plaintiff to Salem Rehabilitation Associates ("SRA") for rehabilitative treatment. (Admin. R. at 678.)

### 3.  Lancaster Family Health Center

On September 9, 2015, Plaintiff initiated care with the Lancaster Family Health Center ("Center") because "she did not like her previous provider." (Admin. R. at 721-22.) Plaintiff informed a registered nurse "she has recently seen neurologist about neck/back pain and awaiting next appt for next steps, hoping to establish metal health care for Hx of trauma and current stress." (Admin. R. at 721.) Plaintiff spoke with Laura White, PsyD ("Dr. White"), and a dietician, both of whom suggested follow-up appointments. (Admin. R. at 721-22.)

PAGE 13 - OPINION AND ORDER

On September 15, 2015, Plaintiff complained to Kathy T. Shaw, M.D. ("Dr . Shaw"), a physician at the Center, of "recurrent self limited episodes of low back pain" improved by muscle relaxants and narcotic pain medications, and reported a history of degenerative bone disease and osteoporosis. (Admin. R. at 722.) Dr. Shaw observed bilateral paraspinal tenderness and muscle spasms, limited range of motion with pain, and antalgic gait. (Admin. R. at 723.) She informed Plaintiff she did not prescribe chronic narcotics for pain and referred her to the pain clinic for "non-pharmacologic management" of Plaintiff's chronic low back pain. (Admin. R. at 723.) Plaintiff later indicated she wanted to postpone visits to the pain clinic pending completion of neuropathy treatment at SRA. (Admin. R. at 762.)

Plaintiff followed up with Dr. White on October 14, 2015, who reported Plaintiff was "experiencing depression in the context of ongoing family disruption and separation. Pt has positive support in her marriage. Sx exacerbated by pt struggling to find meaning without full time employment and family relationships." (Admin. R. at 764.) Dr. White recommended "[o]utpatient counseling to address ongoing grief from multiple losses; pt declined, but noted she may reconsider later." (Admin. R. at 764.) Plaintiff did return for two short follow-up sessions with Dr. White in February and June 2016. (Admin. R. at 770-71, 778.)

On February 1, 2016, Plaintiff sought treatment from Lauren Truxillo, PA-C ("Truxillo") at the Center to follow up on her January 15, 2016 emergency room visit. (Admin. R. at 769.) Plaintiff reported she continued to suffer from exacerbated neck and upper back pain; the emergency room physician told her she had "chronic muscle damage" from previous motor vehicle accidents; she completed one session at the pain clinic but deferred additional visits pending completion of physical therapy; and requested a referral for massage therapy. (Admin. R. at 769-70.) Truxillo observed diffuse tenderness in the upper back and posterior shoulder girdle and

PAGE 14 - OPINION AND ORDER

decreased range of motion bilaterally in the shoulders with external and internal rotation. (Admin. R. at 770.) During a May 31, 2016 visit for abdominal and chronic shoulder pain, Plaintiff indicated the neurotherapist and pain management provider told her that her chronic should pain was "all in her head" and there "was nothing more they could for her." (Admin. R. at 776.) Truxillo explained to Plaintiff the benefits of "mental health treatment and how it would benefit her chronic pain management." (Admin. R. at 777.)

      4. Erik D. Blake, M.D.

Dr. Mendez referred Plaintiff to Erik D. Blake, M.D. ("Dr. Blake") in early May 2015, but the first report from Dr. Blake is dated December 28, 2015. (Admin. R. at 718, 790.) On that date, Plaintiff met with Dr. Blake to follow up on the complaints of chronic neck, bilateral shoulder girdle, and upper back pain. (Admin. R. at 790.) Upon examination, Dr. Blake indicated no change in strength and sensation throughout the upper extremities or range of motion in her neck, with continued pain to palpation in various places along the cervical and upper thoracic spine, as well as the upper trapezius and levator scapula muscles. (Admin. R. at 790.) He noted physical therapy did not provide much improvement and the physical therapist had identified significant psychological stressors. (Admin. R. at 790.) Plaintiff informed Dr. Blake of her appointments with Dr. White and reported "she feels that it is good for her to meet with the psychologist." (Admin. R. at 790.) Dr. Blake engaged in a "lengthy" discussion with Plaintiff about "how psychological distress can manifest as sematic symptoms" and opined "some of her neck and upper back pain is psychogenic in etiology." (Admin. R. at 790.) He recommended Plaintiff complete her course of physical therapy, "focus over the next couple of months on working with her psychologist," and return for a follow up in two months. (Admin. R. at 790.) Plaintiff reported she "expects to see the psychologist twice weekly." (Admin. R. at 790.)

PAGE 15 - OPINION AND ORDER

At the second follow-up appointment with Dr. Blake on February 29, 2016, Plaintiff reported no change in the pain in her neck, shoulders, and upper back with a typical pain of level of six to seven out of ten, and some relief with Advil and hydrocodone. (Admin. R. at 794.) She reported Dr. White referred her to a different psychologist and, when she discovered she was given the wrong address for the psychologist when she arrived for her first appointment, she never called to reschedule. (Admin. R. at 794.) Additionally, while the physical therapist wanted Plaintiff to return for more treatment after counseling, Plaintiff reported she did not feel she benefitted from physical therapy, thought she did better with an at-home exercise program, and did not want to return to physical therapy. (Admin. R. at 794.) Dr. Blake strongly encouraged Plaintiff to reschedule her appointment with the psychologist, explaining it could help to decrease some of her pain and, in any event, would address multiple psychological needs, and continue her home exercise program and medications." (Admin. R. at 794-95.)

### 5. Margaret C. Burden, P.T.

Plaintiff initiated physical therapy with Margaret C. Burden, P.T. ("Burden") on July 22, 2015, on a referral for chronic pain including severe headaches. (Admin. R. at 718.) Plaintiff reported her pain level on a typical day was eight out of ten, she was unable to do most household chores because of the pain, and she got some relief from pain with Naproxen, Advil, and Hydrocodone, and the use of a neck brace at night. (Admin. R. at 719.) Burden observed a high level of guarding with cervical and arm active range of motion which prevented any muscle strength assessment; pain with palpation of bilateral cervical paraspinals, upper traps, and levator scapula muscles bilaterally; and trigger points with the left scalenes, lumbar paraspinals, right QL, and left piriformis. (Admin. R. at 719.) Burden diagnosed Plaintiff with myofascial pain syndrome exacerbated by emotional stressors and recommended a six-week course of twice a week

PAGE 16 - OPINION AND ORDER

visits for manual therapy techniques and modalities, including ultrasound, and evaluation by a pain psychologist, and instructed Plaintiff of the proper use of her TENS unit. (Admin. R. at 720.)

From October 19, 2015, to February 16, 2016, Plaintiff received various forms of physical therapy, including manual therapy, stretching, therapeutic and aquatic exercise, and ultrasound over eleven visits. (Admin. R. at 691-716.) Plaintiff's reported pain level improved by one or two levels after each session and generally over the period of physical therapy. (Admin. R. at 695, 697, 701, 703, 705, 706, 708, 710, 712, 714, 716.) Burden reported Plaintiff's goal of getting quality sleep at night improved by fifty percent; her goal of performing daily chores with pain of three or less improved by twenty-five present but she still had difficulty with chores involving lifting; and her goal of working again was not an option at that time due to emotional stress that continued to be the "driving force which exacerbates her pain." (Admin. R. at 691.) Burden and Plaintiff agreed her progress toward her physical therapy goals had plateaued, and she indicated was scheduled to begin sessions with a psychologist the next day. (Admin. R. at 691.) Burden recommended Plaintiff return for more physical therapy in several months, after she had time to benefit from strategies provided by the psychologist. (Admin. R. at 691.)

C. *Examining Physicians*

In December 2010, Maria Armstrong-Murphy, M.D. ("Dr. Armstrong-Murphy"), performed a comprehensive musculoskeletal evaluation at the request of a state agency. (Admin. R. at 559-562.) Plaintiff complained primarily of severe neck and back pain daily and occasional numbness of the fourth and fifth digit on her left hand. (Admin. R. at 559.) Dr. Armstrong-Murphy diagnosed Plaintiff with "degenerative disc disease of the cervical and lumbar spine with normal neurological exam and axial pain in nature" and "right eye blindness secondary to

childhood trauma." (Admin. R. at 562.) She then opined on Plaintiff's functional limitations as follows:

> Given this claimant's chronic axial cervical and lumbar pain, it seems reasonable that she have some restrictions of no excessive stooping or bending, no lifting objects from the floor greater than 30 pounds. Frequently carrying up to 25 pounds as needed.
>
> No hearing limitations. Seeing limitations given her right eye blindness, however, she is able to travel independently and has lived with this throughout her life time. She seems to be well adapted with very minimal restrictions. No travelling limitations.

(Admin. R. at 562.)

### D. Reviewing Physicians

Linda L. Jenson, M.D. ("Dr. Jenson"), reviewed Plaintiff's medical records and on November 6, 2014, and diagnosed Plaintiff with discogenic and degenerative disorders of the back and retinal detachments and defects, but did not consider Plaintiff disabled. (Admin. R. at 111.) Dr. Jenson believed Plaintiff retained the ability to push and/or pull, climb ramps and stairs, balance, kneel, crouch, handle, finger, and feel; occasionally lift or carry twenty-five pounds, climb ladders, ropes, and scaffolds, stoop, crawl, and reach overhead; frequently lift or carry twenty pounds; stand and/or walk and sit about six hours in an eight-hour workday; had limited depth perception on her right and could not perform tasks requiring binocular vision. (Admin. R. at 120-22.) Accordingly, Dr. Jenson found Plaintiff able to engage in her past relevant work as an apartment manager and daycare owner as actually performed. (Admin. R. at 123.) Martin B. Lahr, M.D. ("Dr. Lahr") another reviewing physician, affirmed Dr. Jenson's diagnosis and findings on February 26, 2015. (Admin. R. at 144-46, 161.)

### E. Images and Testing

Plaintiff's March 3, 2010, cervical spine MRI showed four positive findings:

> Degenerative spondylosis and congenital stenosis involving the cervical spine
> extending from the level of C3-C4 disc space through the C6-C7 disc space.  At
> C3-C4 there is mild central stenosis and severe right-sided neural foraminal
> arrowing.  At the levels of C4-C5 and C5-C6 there is moderate central stenosis and
> moderate bilateral neural foraminal narrowing.  At the level of C6-C7, there is
> moderate central stenosis and mild bilateral neural foraminal narrowing.  No
> evidence of localized cord signal abnormality to suggest core edema.

(Admin. R. at 556.)  A second MRI dated January 8, 2018, showed multilevel degenerative disc

disease and prominent unconvertebral osteoarthropathy, without significant change from the prior

examination dated 3/3/2010 as described above." (Admin. R. at 800.)

X-rays of Plaintiff's cervical spine taken on October 3, 2012, revealed multilevel

degenerative disc disease with spondylitic spurring but no acute disease and normal alignment of

the cervical vertebral bodies.  (Admin. R. at 625.)  There was moderately severe disc space

narrowing of the C4-C5, C5-C6, and C6-C7 levels, moderate narrowing at the C7-T1 level, and

mild narrowing at the C3-C4 level.  (Admin. R. at 625.)  The 2012 x-ray showed no significant

change when compared to x-rays taken in March 2007.  (Admin. R. at 625.)  Findings from

subsequent x-rays dated April 2, 2014, were "consistent with degenerative disc disease and appear

similar to the previous study." (Admin. R. at 638.)

X-rays of Plaintiff's lumbar spine were also taken on April 2, 2014.  (Admin. R. at 640.)

The x-rays showed normal alignment of the vertebral bodies, mild narrowing of the L4-L5 disc

space consistent with degenerative disc disease, and facet arthropathy at L4-L5 and L5-SI.

(Admin. R. at 640.)

X-rays were taken of Plaintiff's left shoulder on October 3, 2012, that demonstrated mild

degenerative changes in the AC joint but no fracture, persisting dislocation, or focal lytic or blastic

changes.  (Admin. R. at 627.)  X-rays of Plaintiff's right shoulder dated April 2, 2014, similarly

revealed degenerative changes in the AC joint but no evidence of a bone lesion or soft tissue

calcification and normal joint space.  (Admin. R. at 641.)  An ultrasound of Plaintiff's right shoulder showed no evidence of a rotator cuff tear with "marked thickening of the subacromial-subdeltoid bursa consistent with bursitis.  (Admin. R. at 642.)

Nerve studies on Plaintiff's right hand on November 4, 2014, were considered normal. (Admin. R. at 747.)  Plaintiff exhibited give way with testing of strength through the entirety of the right upper extremity, decreased sensation to pinprick in the palmar aspect of all digits, and negative Tinel's and carpal compression tests of the right hand.  (Admin. R. at 747.)  EMG and NCV findings indicated the right median and ulnar sensory and motor nerves were normal, all examined muscles with the right C5-T1 myotomes showed no evidence of electrical instability. (Admin. R. at 747.)

## III.  Vocational Evidence

Francene M. Geers, impartial vocational expert ("Geers"), appeared at the Second Hearing and responded to follow-up vocational interrogatories propounded by ALJ Jones after that hearing. (Admin. R. at 32, 507.)  At the Second Hearing, Geers classified Plaintiff's position with Cascade as an "apartment house manager job" based on the work history form Plaintiff completed and "didn't add in the maintenance worker because I didn't see it described."  (Admin. R. at 33.)  Geers classified apartment manager as skilled, light work[4] with an SVP of 5.  (Admin. R. at 33-34.)  She

---

[4] "Light Work" is defined in 20 C.F.R. 404.1567(b) as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do

then stated the maintenance work described by Plaintiff at the Second Hearing qualified as janitor/apartment maintenance worker which she classified as a semi-skilled, medium job with an SVP of 3.  (Admin. R. at 34.)

ALJ Jones asked Geers if a hypothetical individual of Plaintiff's age, education, and work experience able to perform at the medium exertional level with additional restrictions in lifting, climbing, stooping, crawling, reaching overhead, exposure to hazards, and binocular vision could perform Plaintiff's past work as actually or generally performed.  (Admin. R. at 34-37.)  Geers testified such an individual would be able to perform Plaintiff's past work as assistant apartment house manager as well as the jobs of usher, housekeeper, and photocopy machine operator. (Admin. R. at 35-37.)

On April 10, 2017, Geers completed vocational interrogatories posed in writing by ALJ after the Second Hearing ("Interrogatories").  (Admin. R. 517-520.)  In the Interrogatories, ALJ Jones asked Geers to consider a hypothetical individual born on July 7, 1960, with a high school education, the ability to communicate in English, and capable of light work with the following modifications:

> This individual is able to lift 25 pounds occasionally and 20 pounds frequently. This individual is able to perform work that does not require climbing ladders/ropes/scaffolds.  The individual is able to occasionally stoop and crawl. The individual is able to occasionally reach overhead bilaterally.  The individual is able to perform tasks that do not require binocular vision.  This individual is able to perform work that does not require exposure to hazards.

(Admin. R. at 517.)  Geers opined such individual could perform Plaintiff's past relevant work as "manager, apartment house.  Light in nature, lift 20 pounds occasionally, 10 pounds frequently.

---

sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Binocular vision is not required.  Overhead reaching is no more than occasional.  (Admin. R. at 518.)  Geers offered the alternative jobs of photocopying machine operator, collator operator, and cleaner housekeeper.  (Admin. R. at 519.)

IV.  ALJ Decision

ALJ Jones found Plaintiff suffered from the severe impairments of right-eye blindness and cervical spine stenosis/spondylosis, and that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 6, 2012.  (Admin. R. at 169.)  While conceding Plaintiff's impairments limited her ability to perform basic work activities, ALJ Jones found such impairments did not meet or equal the severity of any listed impairment.  (Admin. R. at 170.)  ALJ Jones considered Plaintiff's impairments and found her capable of performing light work that does not require binocular vision or exposure to hazards; of lifting twenty pounds frequently; and of lifting twenty-five pounds, stooping, crawling and reaching overhead occasionally; but unable to climb ladders, ropes, or scaffolds.  (Admin. R at 171.)

Despite these limitations, ALJ Jones deemed Plaintiff capable of performing the physical and mental demands of her past relevant work as an apartment manager, both as described and as actually performed.  (Admin. R. at 178-79.)  ALJ Jones acknowledged ALJ Murgo's decision and determined Plaintiff had established a change in circumstances, including an alleged worsening of her condition and the existence of an impairment not previously considered, as well as new and material evidence relevant to certain issues adjudicated in the prior proceedings, but she rejected both ALJ Murgo's finding of new non-severe impairments and the results of the physical residual functional capacity assessment.  (Admin. R. at 166.)  She also found the record contained "no new and material evidence . . . with regard to Plaintiff's education and past relevant work," and expressly adopted ALJ Murgo's finding that Plaintiff "had past relevant work as an apartment

PAGE 22 - OPINION AND ORDER

manager, which is classified under DOT code 186.167-018 at the light exertional level, skilled

SVP 5." (Admin. R. at 167, 178.)

In accordance with Social Security Ruling ("SSR") 00-4P, ALJ Jones accepted Geers's

testimony, explaining:

> In response to the interrogatories in the current claim, the vocational expert stated that a hypothetical individual with the same residual functional capacity as the claimant could perform the job of apartment manager as actually and generally performed. The vocational expert stated that her statements were consistent with the DOT. She noted that while the DOT does not address reaching, relying on her professional experience, she concluded that the job does not require more than occasional overhead bilateral reaching.

(Admin. R. at 178.)

ALJ Jones also discussed Plaintiff's conflicting descriptions of her daily apartment

manager activities:

> The undersigned notes that the claimant made inconsistent statements about her job duties as an apartment manager. In her Work History Report, she described the job in the sedentary to light exertional range. She stated that the job involved processing applications, making phone calls, inspecting apartments, having vehicles towed, and filing legal court complaints against tenants. She stated that during the workday, she lifted less than 1 pound, walked 2 hours, stood 2 hours, sat 3.5 hours, reached 1 hour, kneeled 20 minutes, and wrote, typed, or handled small objects for 2 hours. She stated that her husband also worked at the property, and his duties involved heavy work. At the hearing, she initially testified that in addition to her apartment manager duties, she spent 65 percent of every day doing apartment maintenance work, including repairing and cleaning apartments. However, when questioned about the inconsistencies between her testimony and her written description of the job, she stated that she only filled in for her husband when he could not be there. Based on the information provided by the claimant in her Work History Report and testimony, the undersigned finds that maintenance duties were not part of her regular job responsibilities as an apartment manager.

(Admin. R. at 178-79.) ALJ Jones then expressly found Plaintiff "has not been under a disability,

as defined in the Social Security Act, from October 6, 2012, through the date of this decision."

(Admin. R. at 179.)

PAGE 23 - OPINION AND ORDER

ALJ Jones found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Admin. R. at 172.) ALJ Jones discounted Plaintiff's testimony about the limiting effects of her impairments, noting "her treatment has been largely conservative and included medication management and one month of physical therapy." (Admin. R. at 177.) She specifically noted Plaintiff's reports of "improvement in symptoms from Advil, pain medication, and massage therapy," and "failure to follow the recommendations of her treatment providers with respect to her psychological concerns, suggest that [Plaintiff's] symptoms are not as severe as alleged." (Admin. R. at 177.)

ALJ Jones also identified other inconsistencies in the record, such as Plaintiff's claim that strength and nerve tests indicated she had permanent nerve damage, and her testimony she uses a walker and needs support from her husband when she does the laundry, which were either not consistent with or supported by medical evidence in the record. (Admin. R. at 177.) Finally, ALJ Jones questioned Plaintiff's report she is unable to lift anything heavier than a liter of soda, in light of her testimony she is primarily responsible for taking care of two Pomeranians. (Admin. R. at 177.)

*Standard of Review*

The Act provides for payment of DIB to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1) (2019). In addition, SSI may be available to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a) (2019). The burden of proof to establish a disability rests upon the claimant. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.),

*cert. denied*, 519 U.S. 881 (1996) (DIB); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992) (SSI). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A) (2019). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual not only is unable to do previous work but, considering his or her age, education, and work experience, also cannot engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2) (A) and 1382c(a)(3)(B) (2019).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI because he or she is disabled. 20 C.F.R. §§ 404.1520 and 416.920 (2019); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, Benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments,

PAGE 25 - OPINION AND ORDER

the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past.  If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy considering his or her age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995) (DIB); *Drouin*, 966 F.2d at 1257 (SSI).  The claimant is entitled to Benefits only if he or she is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

When an individual seeks either DIB or SSI because of disability, judicial review of the Commissioner's decision is guided by the same standards.  42 U.S.C. §§ 405(g) and 1383(c)(3) (2019).  The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Robbins* v. *Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tylitzki* v. *Shalala,* 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins,* 466 F.3d at 882; *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  Thus, where

PAGE 26 - OPINION AND ORDER

the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007). However, a reviewing court may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007); *see also Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

## Discussion

Plaintiff asserts ALJ Jones erred by considering her past relevant work as apartment manager, rather than a composite job as apartment manager and apartment maintenance, and by improperly discounting her testimony about her pain, fatigue, and resulting limitations. Plaintiff seeks an order reversing the Commissioner's final decision and remanding for an immediate award of Benefits or, alternatively, for additional evidence and findings. The Commissioner contends affirmance is appropriate because ALJ Jones properly considered the evidence consistent with the Act and related regulations.

I.  Past Relevant Work

### A.  Res Judicata

Plaintiff contends ALJ Jones erred by applying the doctrine of *res judicata* and adopting ALJ Murgo's findings with regard to past relevant work. The principles of *res judicata* apply to

administrative decisions but the doctrine is not to be applied "rigidly." *Chavez v. Bowen¸ 844 F.2d 691, 693 (9th Cir. 1988)*.  According to AR 97-4(9), the presumption may be rebutted by showing a "changed circumstance" affecting the issue of disability with respect to the unadjudicated period, such as the increased severity of an impairment, or an alleged impairment not previously considered.  *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985); *Gregory v. Bowen*, 844 F.2d 664, 666 (9th Cir. 1988).

ALJ Jones did not apply *res judicata* to ALJ Murgo's findings with regard to Plaintiff's impairments and residual functional capacity, noting a change in circumstances on these issues. However, ALJ Jones adopted ALJ Murgo's findings with respect to Plaintiff's past relevant work as an apartment manager, explaining the record contained no new evidence on Plaintiff's education or the duties of her past relevant work.  Plaintiff did not work during the period between ALJ Murgo's decision and the Second Hearing, thus establishing the absence of a change in circumstance regarding Plaintiff's past relevant work.  Consequently, ALJ Jones properly determined *res judicata* did not apply to issues related to Plaintiff's work as an apartment manager and was entitled to rely on ALJ Murgo's analysis of Plaintiff's past relevant work.

Moreover, ALJ Jones independently and fully addressed Plaintiff's past relevant work based on evidence offered both before and after ALJ Murgo's decision, virtually eliminating any harm Plaintiff may have suffered as a result of ALJ Jones's reference to, and reliance on, ALJ Murgo's consideration of Plaintiff's past relevant work.  Additionally, ALJ Jones found Plaintiff capable of performing the job of apartment manager as actually and generally performed while ALJ Murgo considered Plaintiff capable of performing her past relevant work as generally performed only, clearly distinguishing ALJ Jones's decision from that of ALJ Murgo and establishing ALJ Jones's independent analysis of the issue.  ALJ Jones did not err in adopting ALJ

PAGE 28 - OPINION AND ORDER

Murgo's characterization of Plaintiff's past relevant work as an apartment manager.  *See Chavez,*
*844 F.2d at 694* (even if the trailing case involves new facts and issues, "[t]he first ALJ's findings
concerning the claimant's residual functional capacity, education, and work experience are entitled
to some *res judicata* consideration").

B. *Step Four Analysis*

Plaintiff also asserts ALJ Jones erred at step four of the sequential analysis by not finding
Plaintiff's past relevant work was most consistent with a composite job of apartment manager and
apartment maintenance/janitor.  A claimant has the burden at step four of the sequential analysis
to prove that she cannot perform her past relevant work.  *Valentine v. Comm'r Soc. Sec. Admin.,*
*574 F.3d 685, 689 (9th Cir. 2009).*  The ALJ must make findings that support the conclusion that
a claimant is able to perform past relevant work "either as actually performed or as generally
performed in the national economy." *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002).  In
making his determination at step four, the ALJ is therefore permitted to consider a plaintiff's past
relevant job title and the duties the plaintiff actually performed.  To meet his burden at step four,
the claimant must prove an inability to return to his "former *type of work* and not just his former
job." *Pinto v. Massanari,* 249 F.3d 840, 844–45 (9th Cir. 2001) (emphasis added).  When
"defining a claimant's past relevant work as actually performed, the ALJ may use 'a properly
completed vocational report' and 'the claimant's own testimony.'" *Albritten v. Berryhill*, No. CV
17-0925-JPR, 2018 WL 3032860, at *3 (C. D. Cal. June 14, 2018) (quoting *Pinto*, 249 F.3d at
845).

Here, the pivotal issue is whether Plaintiff's past relevant work, as actually performed, was
limited to the apartment manager position or was a composite of the jobs of apartment manager
and apartment maintenance.  As ALJ Jones noted, Plaintiff's various descriptions of her job duties

PAGE 29 - OPINION AND ORDER

were not entirely consistent.  In the first description, found in the Work History Report completed shortly after Plaintiff left her job as an apartment manager, she described her duties to include primarily office work with only light-duty maintenance obligations.  In the second Work History Report, Plaintiff expanded her duties to include lifting and heavy work, but noted her husband was hired as an assistant manager to perform these duties, so her duties as actually performed were still limited to office work.  Even at the Second Hearing, Plaintiff stated her apartment manager job was sixty-five per cent maintenance work, but she also testified she concentrated on the office work while her husband performed all of the maintenance work until he obtained full-time employment elsewhere.  Again, Plaintiff's duties as actually performed included primarily, if not solely, office work.

Plaintiff's apartment manager job may have included some maintenance work at some point during her employment.  However, Plaintiff's testimony makes clear that the duties she performed for the majority of her employment were limited to office work, providing evidentiary support for ALJ Jones's finding Plaintiff's job duties, as actually performed, were those of an apartment manager.  This finding is further supported by Geers's characterization of Plaintiff's past relevant work as apartment house manager, based on Plaintiff's failure to include maintenance work when describing her job duties in her work history form.  Furthermore, even assuming the evidence also could support a finding Plaintiff's job duties included some maintenance work, the court must uphold the ALJ's decision when the evidence can support either affirming or reversing the ALJ's conclusion.  ALJ Jones did not err in finding Plaintiff's past relevant work, as actually performed, was apartment manager, not a composite job of apartment manager and apartment maintenance.

\ \ \ \ \

PAGE 30 - OPINION AND ORDER

II.  Plaintiff's Testimony

Plaintiff also argues ALJ Jones erred by failing to identify specific, clear, and convincing reasons supported by substantial evidence in the record to discount her subjective symptoms.  To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis.  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017); 20 C.F.R. § 416.929 (2019).  The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).  At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms.  *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Lingenfelter*, 504 F.3d at 1036.  The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony.  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).  Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony.  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2013); *Tommasetti*, 533 F.3d at 1039.  "Credibility determinations are the province of the ALJ" and the court may not "second-guess" the ALJ's determination if they have made specific findings that are supported by substantial evidence in the record.  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).

ALJ Jones found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" and did not identify any evidence to establish Plaintiff was malingering.  (Admin. R. at 172.)  Consequently, ALJ Jones was required to offer

clear and convincing reasons for rejecting Plaintiff's testimony with regard to the limitations supported by objective evidence.  To meet this standard, "[t]he ALJ must specify what testimony is not credible and identify the evidence that undermines the claimant's complaints – '[g]eneral findings are insufficient.'" *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005), (quoting *Reddick v. Chater*, 157 F.3d 715,722 (9th Cir. 1998)); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (*en banc.*)  ("[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.")

ALJ Jones expressly found Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (Admin. R. at 172.)  The Ninth Circuit has expressly held a boilerplate statement such as this, without more, "falls short of meeting the ALJ's responsibility to provide 'a discussion of the evidence' and 'the reason or reasons upon which' his adverse determination is based." *Treichler v. SSA*, 775 F.3d 1090, 1103 (9th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)); *Brown-Hunter*, 806 F.3d at 493 (ALJ's finding that limitations identified by claimant were less serious than alleged based on unspecified claimant testimony and a summary of medical evidence insufficient to meet clear and convincing standard).  Here, however, ALJ Jones engaged in additional discussion of the evidence and reasons for discounting Plaintiff's testimony.

### A. Conservative Treatment

ALJ Jones discounted Plaintiff's testimony based on treatment he described as "largely conservative" and included only medication management and one course of physical therapy.  Evidence of conservative treatment "is sufficient to discount a claimant's testimony regarding the

severity of an impairment." *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir. 2007). The record clearly supports ALJ Jones's conclusions with regard to conservative treatment.

### B. Failure to Follow Recommended Treatment

Plaintiff's failure to follow recommended treatment, particularly with respect to her psychological issues, was another justification offered by ALJ Jones to discount Plaintiff's symptom testimony. The ALJ may cite a claimant's failure to follow recommended treatment in finding her not credible. *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair,* 885 F.2d at 604 (concluding failure to seek treatment may inform ALJ's credibility determination). However, the Ninth Circuit explicitly notes "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chafer,* 100 F.3d 1462, 1465 (9th Cir.1996) (quoting *Blakenship v. Bowen,* 874 F.2d 1116, 1124 (6th Cir.1989)).

The record establishes that more than one treating provider recommended psychological counseling and that Plaintiff failed to seek such treatment. Plaintiff's psychological issues were related to pain management, not poor judgment, and do not excuse such failure. Plaintiff stated she thought it was good for her to meet with a psychologist, yet she never attempted to reschedule her appointment after missing the appointment due to a wrong address. This supports ALJ Jones's decision to discount Plaintiff's testimony based on this factor. *Molina,* 674 F.3d at 1113 (quoting *Tommasetti,* 533 F.3d at 1039)("unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is a clear and convincing reason to reject a plaintiff's credibility.)

\ \ \ \ \

\ \ \ \ \

### C. Inconsistencies in Record

An ALJ may consider a range of factors in assessing credibility, including . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid. *Ghanim,* 763 F.3d at 1163 (citing *Smolen,* 80 F.3d at 1284; *Orn,* 495 F.3d at 636).  Here, ALJ Jones noted Plaintiff misrepresented that strength and nerve tests showed she had permanent nerve damage.  The only nerve study in the record shows normal findings.  ALJ Jones also identified Plaintiff's alleged need to use a walker and her inability to lift more than a liter of soda[5] as inconsistent with other evidence in the record.  Such evidence includes observations from various medical providers that Plaintiff had a normal gait or walked without an assistive device, the absence of a prescription for a cane, and Plaintiff's testimony she was primarily responsible for the care of her two Pomeranians.[6]  Inconsistency evidence in the record is a third clear and convincing reason to discredit Plaintiff's subjective symptom testimony.

### D. Medication Alleviated Symptoms

Finally, ALJ Jones noted Plaintiff reported improvement with the use of pain medication and muscle relaxants.  This finding is supported by chart notes provided by various medical providers describing Plaintiff's statements, as well as evidence Plaintiff filled her prescription pain medication only twice in 2015, inferring Plaintiff's over-the-counter pain medication was generally sufficient.  Evidence of medical treatment successfully relieving symptoms can

---

[5] The court takes judicial notice that a liter of soda weighs slightly more than 2.2. pounds.  *See* https://www.answers.com/Q/How_much_does_a_liter_of_soda_weigh (last visited October 30, 2020).

[6] The court takes judicial notice that Pomeranians weigh between three and seven pounds.  *See* https://www.akc.org/dog-breeds/pomeranian (last visited October 30, 2020).

PAGE 34 - OPINION AND ORDER

undermine a claim of disability. *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1)).

    *E.  Conclusion*

    The court finds ALJ Jones properly concluded that evidence of conservative medical treatment, failure to follow through with recommended treatment, inconsistent statements, and alleviation of symptoms with medication contradicted and belied Plaintiff's reported symptoms and limitations.  Accordingly, ALJ Jones offered the requisite clear and convincing reasons to discount Plaintiff's testimony, all of which were supported by substantial evidence in the record.

*Conclusion*

    The Commissioner's findings on Plaintiff's disabilities, considering the record as a whole, are supported by substantial evidence.  The decision of the Commissioner is AFFIRMED.

    DATED this 16th day of December, 2020.

                                       JOHN V. ACOSTA
                             United States Magistrate Judge